Versión para imprimir



EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Maderas Tratadas, Inc.; Luis J. Fernández en su Carácter Personal <br>     Recurridos <br><br>         v. <br><br> Sun Alliance Insurance Company; El Fenix de Puerto Rico; Juan del Pueblo <br><br> Universal Insurance Company <br>     Peticionaria <br> ──────────────────────────── <br> Maderas Tratadas, Inc.; Luis J. Fernández en Su Carácter Personal <br>     Peticionarios <br><br>         v. <br><br> CBI Security Services, Inc.; Juan D. González Colón, su esposa Jane Doe y la Sociedad Legal de Gananciales Constituída por ambos; Compañía de Seguros ABC; Compañía de Seguros XYZ; Fulano de Tal y Sutano de Tal <br>     Recurridos | Certiorari <br><br> 2012 TSPR 101 <br><br> 185 DPR ____ |

Número del Caso: CC-2006-228
cons.
CC-2006-266

Fecha: 12 de junio de 2012

Tribunal de Apelaciones:

      Región Judicial de Bayamón

Abogado de la Parte Peticionaria:

      Lcdo. José Andreu Fuentes

Abogados de la Parte Recurrida:

      Lcdo. René Pinto Lugo
      Lcda. Gladys Guemarez
      Lcdo. José Alfaro Delgado
      Lcdo. Antonio Marrero Candelaria
      Lcdo. Edgar Albelo Matos

Materia: Seguros – Cubierta por ocurrencias; doctrina de descenso de nivel ("drop down")

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| | *Certiorari* |
| MADERAS TRATADAS, INC.;<br>LUIS J. FERNÁNDEZ EN SU<br>CARÁCTER PERSONAL<br><br>Recurridos<br><br>v.<br><br>SUN ALLIANCE INSURANCE<br>COMPANY; EL FÉNIX DE PUERTO<br>RICO; JUAN DEL PUEBLO<br><br>UNIVERSAL INSURANCE COMPANY<br><br>Peticionaria | Núm.: **CC-2006-0228**<br><br>CONSOLIDADO CON |
| MADERAS TRATADAS, INC.;<br>LUIS J. FERNÁNDEZ EN SU<br>CARÁCTER PERSONAL<br><br>Peticionarios<br><br>v.<br><br>CBI SECURITY SERVICES,<br>INC.; JUAN D. GONZÁLEZ<br>COLÓN, SU ESPOSA JANE DOE Y<br>LA SOCIEDAD LEGAL DE<br>GANANCIALES CONSTITUIDA POR<br>AMBOS; COMPAÑÍA DE SEGUROS<br>ABC; COMPAÑÍA DE SEGUROS<br>XYZ; FULANO DE TAL Y SUTANO<br>DE TAL<br><br>Recurridos | **CC-2006-0266** |

Opinión del Tribunal emitida por el Juez Asociado señor FELIBERTI CINTRÓN

En San Juan, Puerto Rico, a 12 de junio de 2012.

El hurto de materiales acaecido en un negocio de ferretería, propiedad de Maderas Tratadas, Inc. (Maderas

Tratadas), dio origen a una trilogía de recursos de los cuales únicamente nos toca atender las controversias planteadas en el recurso CC-2006-0228 y parte de los errores aducidos en el recurso CC-2006-0266.[1]  En el primero de éstos se han suscitado controversias relacionadas al contrato de seguro otorgado entre Universal Insurance Company (Universal), y CBI Security Services, Inc. (CBI), compañía de seguridad.  Como parte de dichas interrogantes, nos toca resolver si Universal actuó correctamente al denegar cubierta fundamentada en que los hechos imputados a CBI en calidad de asegurado constituyen incumplimiento de contrato y no una ocurrencia ("occurrence"), según el término aparece definido en la póliza correspondiente.  De determinar que, en efecto, existe cubierta, procede entonces precisar si son de aplicación ciertas exclusiones según consignadas en la póliza.  Igualmente, nos corresponde dirimir si se configuran los requisitos necesarios para obligar a

---

[1]     Maderas Tratadas y Luis J. Fernández expusieron de manera conjunta los argumentos atinentes a tres (3) recursos relacionados mediante su *Alegato de los recurridos Maderas Tratadas, Inc. y Luis J. Fernández y Réplica al Alegato de la recurrida Sun Alliance*, sometido el 19 de septiembre de 2006 aunque, por error, citó el caso ante nos como CC-2006-0229, en lugar de CC-2006-0228.  Los otros dos (2) recursos son: Maderas Tratadas, Inc., *et al.* v. Sun Alliance Insurance Company, *et al.*, CC-2006-0266 y Maderas Tratadas, Inc., *et al.* v. Sun Alliance Insurance Company, *et al.,* CC-2006-0267.  Dicho escrito se unió al recurso CC-2006-0266.  Aun cuando ordenamos la consolidación de los recursos CC-2006-0266 y CC-2006-267 el 19 de mayo de 2006, denegamos la solicitud de consolidación en el recurso CC-2006-0228 mediante Resolución de 20 de diciembre de 2006.  No obstante, el 13 de septiembre de 2011, Maderas Tratadas y Luis J. Fernández Díaz solicitaron el desistimiento del recurso CC-2006-0267 instado en contra de Sun Alliance Company, así como de las reclamaciones en contra de dicha aseguradora según vertidas en el CC-2006-0266.  Mediante Resolución emitida el 10 de mayo de 2012 accedimos a lo solicitado y anulamos el auto de *certiorari* previamente expedido en el recurso CC-2006-0267.  Además, en el día de hoy dejamos sin efecto nuestra denegatoria objeto de la Resolución de 20 de diciembre de 2006 arriba indicada, y concedemos la consolidación del recurso CC-2006-0266 con el recurso CC-2006-0228.

Universal, a pesar de haber emitido una póliza sombrilla, a asumir la posición de asegurador primario conforme la teoría de descenso de nivel o "drop down".

En lo concerniente al CC-2006-0266, primeramente examinaremos la responsabilidad correspondiente a la Asociación de Garantías de Seguros Misceláneos (Asociación) a base de las reclamaciones presentadas por Maderas Tratadas. Luego evaluaremos la reducción en la cuantía de los honorarios concedidos por el foro primario atribuibles a los gastos incurridos por Maderas Tratadas en uno de sus peritos.

Luego de examinar los planteamientos esgrimidos por Universal, conjuntamente con los documentos que obran en autos y a la luz del derecho aplicable, procedemos a confirmar la determinación recurrida en todos sus aspectos, excepto en lo atinente a la aplicación de la doctrina del descenso de nivel ("drop down"). Veamos.

I

Maderas Tratadas es una corporación dedicada al negocio de ferretería con parte de sus facilidades ubicadas en Toa Baja, Puerto Rico. En septiembre de 1989, Maderas Tratadas contrató a CBI para prestar servicios de vigilancia con guardias armados las veinticuatro (24) horas del día, los siete (7) días de la semana, en la propiedad arriba indicada.

Durante el verano de 1992, personal de Maderas Tratadas se percató de una serie de hurtos y escalamientos en el edificio donde operaba la ferretería. Específicamente, alrededor del 22 de junio de 1992 y durante el fin de semana del 26 de junio de 1992, se encontraron ventanas rotas y forzadas, así como escalamientos en el área de la ferretería.

La gerencia de Maderas Tratadas informó los incidentes al Sr. Fernando Matos, gerente de operaciones de CBI, así como al Cuerpo de Investigaciones Criminales de la Policía de Puerto Rico (CIC). La correspondiente investigación policiaca culminó con el arresto y convicción del Sr. José Alberto Concepción García, ex empleado de Maderas Tratadas, y el Sr. Juan González Colón (guardia González) quien, para la época de los sucesos, laboraba como guardia de seguridad para CBI. Los acusados admitieron haber perpetrado y/o haber consentido a que terceras personas llevaran a cabo múltiples sustracciones de mercancía propiedad de Maderas Tratadas.[2]

Una auditoría externa de los negocios de la empresa correspondiente al año fiscal comprendido entre el 1 de agosto de 1991 al 31 de julio de 1992 y concluida en diciembre de 1992, reflejó un faltante de inventario atribuible a mercancía robada de dos millones

---

[2] Conforme la evidencia creíble al juzgador, el guardia González no sólo permitió la entrada de individuos al lugar para sustraer mercancía, sino que llegó a dar acceso a un furgón tipo "Sea Land" de aproximadamente cuarenta (40) a cincuenta (50) pies de largo para adelantar tales propósitos.

cuatrocientos mil doscientos noventa y ocho dólares ($2,400,298.00).

Al momento de los hechos, Maderas Tratadas contaba con una póliza expedida a su favor por Sun Alliance Insurance Company (Sun Alliance) que cubría específicamente riesgo de robo hasta un total de ocho millones noventa y ocho mil cuatrocientos dólares ($8,098,400.00). No obstante, Sun Alliance denegó cubierta.

CBI por su parte poseía varias pólizas de seguro para las fechas pertinentes. Por un lado, tenía expedida a su favor una póliza primaria con una partida por responsabilidad pública expedida por Insurance Company of Florida (ICF), póliza #28-000905 con una cubierta de un millón de dólares ($1,000,000.00). Dicha aseguradora fue declarada insolvente y sujeta al proceso de liquidación de sus activos mediante Orden emitida por el Tribunal de Primera Instancia, Sala Superior de San Juan, el 27 de enero de 1993. En virtud de la Ley 72-1991, según enmendada, 26 L.P.R.A. secs. 3801-3819 (2008 y Supl. 2011) (Ley 72), la Asociación compareció en el litigio como entidad a cargo de las reclamaciones instadas en contra de ICF.

De otra parte, CBI tenía también dos (2) pólizas en exceso tipo sombrilla con Universal. Estas son: (1) póliza Núm. UMB-102, vigente del 20 de noviembre de 1990

al 20 de noviembre de 1991, con un límite combinado de un millón de dólares ($1,000,000.00) y (2) póliza Núm. UMB-131, vigente del 20 de noviembre de 1991 al 20 de noviembre de 1992, con un límite anual por agregado ascendente a un millón de dólares ($1,000,000.00).

Maderas Tratadas y el Sr. Luis J. Fernández (señor Fernández) instaron una Demanda en contra de Sun Alliance alegando incumplimiento de contrato y daños y perjuicios por la denegatoria de cubierta de ésta (Caso Civil Núm. D AC1993-0221). Igualmente, el 14 de abril de 1993 iniciaron una acción en contra de CBI y sus aseguradoras sobre incumplimiento de contrato y daños y perjuicios (Caso Civil Núm. D AC1993-0222).

Luego de varios trámites procesales, se dieron por enmendadas las alegaciones de la referida Demanda (D AC1993-0222) para identificar las siguientes entidades como aseguradoras de CBI: (1) ICF y/o la Asociación y (2) Universal como aseguradora en exceso de los límites de las pólizas de ICF y/o la Asociación.

Oportunamente, los dos (2) casos iniciados por Maderas Tratadas y el señor Fernández fueron consolidados a nivel de instancia y luego de los trámites procesales pertinentes se celebró el juicio en su fondo. El Tribunal de Primera Instancia emitió su Sentencia el 13 de febrero de 2003 declarando con lugar las reclamaciones vertidas en ambas Demandas y condenando a CBI, Sun Alliance, la

Asociación y Universal a pagarle solidariamente a Maderas Tratadas las siguientes sumas: (1) dos millones cuatrocientos mil doscientos noventa y ocho dólares ($2,400,298.00) por la pérdida correspondiente al hurto de su inventario, (2) tres millones setecientos cincuenta y ocho mil ciento siete dólares ($3,758,107.00) por pérdidas en ventas, (3) quinientos veinte mil dólares ($520,000.00) por la pérdida de cánones de arrendamiento en su local en Arecibo, (4) sesenta y seis mil setecientos cincuenta y seis dólares ($66,756.00) por la pérdida producida al tener que vender por debajo de su valor las propiedades de Arecibo y Carolina, y (5) trescientos setenta y cinco mil con sesenta dólares ($375,060.00) por la pérdida de plusvalía o "goodwill" de dicha entidad.

Además, los condenó a pagarle solidariamente al señor Fernández la cantidad de un millón setecientos veinticuatro mil dólares ($1,724,000.00) por los daños sufridos al tener que despojarse de sus activos para afrontar la crisis económica de la empresa como consecuencia de los hechos que dieron base a las reclamaciones vertidas en sus Demandas.

El Tribunal de Primera Instancia entendió que las aseguradoras habían incurrido en mala fe al denegar cubierta bajo sus respectivas pólizas, por lo que respondían solidariamente por los daños derivados de dicha

conducta, independientemente de los límites provistos en las mismas.

Por último, el Tribunal de Primera Instancia entendió que CBI y las aseguradoras habían sido temerarias al no acceder a los reclamos de Maderas Tratadas y el señor Fernández, por lo que se les condenó al pago de intereses desde la fecha de radicación de la Demanda, así como el pago solidario de cincuenta mil dólares ($50,000.00) por concepto de honorarios de abogado, además de las costas y gastos del litigio.

En lo atinente a la responsabilidad de CBI, el Tribunal de Primera Instancia determinó que ésta fue negligente al no supervisar a sus guardias de seguridad y al no ejercer el debido cuidado al escogerlos.

Asimismo dictaminó que, al ICF declararse insolvente, correspondía a la Asociación responder hasta la suma estatutaria de ciento cincuenta mil dólares ($150,000.00) por cada una de las diecisiete (17) reclamaciones sometidas por Maderas Tratadas, hasta llegar al límite de la póliza emitida por ICF, es decir, un millón de dólares ($1,000,000.00).

De otra parte, aplicando el principio de descenso de nivel ("drop down"), decretó que correspondía a Universal asumir la posición de ICF, asegurador primario, al haber sido éste declarado insolvente.

Posteriormente, mediante Resolución de 1 de mayo de 2003, el Tribunal de Primera Instancia aprobó en su totalidad el Memorando de Costas sometido por Maderas Tratadas.

Inconformes, CBI, Sun Alliance, la Asociación y Universal recurrieron por separado ante el Tribunal de Apelaciones solicitando la revocación de la Sentencia del Tribunal de Primera Instancia, así como la revisión de la Resolución atinente a las costas del litigio. El Tribunal de Apelaciones dispuso de las cuatro (4) apelaciones conjuntamente mediante Sentencia emitida el 30 de junio de 2005. Posteriormente, en respuesta a la solicitud de reconsideración sometida por Maderas Tratadas y el señor Fernández, el foro apelativo intermedio dictó Sentencia Enmendada el 15 de febrero de 2006 a los únicos fines de reconsiderar su determinación previa atinente a la pérdida de plusvalía del negocio de Maderas Tratadas y ciertas costas previamente concedidas en el pleito.

Entre sus determinaciones, el tribunal apelativo intermedio coincidió con el dictamen del foro primario a los efectos de que: (1) CBI fue negligente al no ejercer el debido cuidado al contratar sus guardias de seguridad y al no supervisarlos adecuadamente; (2) las pólizas de seguro expedidas por Sun Alliance, la Asociación y Universal, respectivamente, proveían cubierta por los

daños reclamados, a la vez que procedía la determinación de temeridad.

No obstante, el Tribunal de Apelaciones decretó que la Asociación únicamente respondía hasta el límite total de ciento cincuenta mil dólares ($150,000.00) y circunscribió el dictamen atinente a la mala fe por denegatoria de cubierta de Sun Alliance. Dispuso, además, que la única póliza vigente emitida por Universal para efectos del litigio lo era la Núm. UMB-131 con un límite de cubierta de un millón de dólares ($1,000,000.00), sujeta a la teoría de descenso de nivel ("drop down").

Como resultado del dictamen del Tribunal de Apelaciones, según indicáramos anteriormente, surgieron tres (3) recursos separados ante este Foro de los cuales sólo quedan pendientes los casos consolidados de epígrafe. Mediante Resolución de 12 de mayo de 2006, expedimos el auto de *certiorari* solicitado en el recurso CC-2006-0228 y el 19 de marzo de 2006 expedimos el auto en el recurso CC-2006-0266.

Comenzamos por resolver las controversias correspondientes al recurso CC-2006-0228.

## II

### CC-2006-0228

Inconforme con la Sentencia emitida por el Tribunal de Apelaciones, Universal acudió ante nos consignando los siguientes errores:

1. ERRÓ EL TRIBUNAL DE APELACIONES AL DETERMINAR QUE LA PÓLIZA SOBRE RESPONSABLIDAD PÚBLICA EMITIDA POR UNIVERSAL PROVEÍA CUBIERTA PARA LOS HECHOS DEL PRESENTE CASO A PESAR DE QUE LOS MISMOS TRATAN SOBRE UN INCUMPLIMIENTO DE CONTRATO POR PARTE DEL ASEGURADO Y NO DE UNA OCURRENCIA ("OCCURRENCE") CUBIERTA POR LA MISMA.

2. ERRÓ EL TRIBUNAL DE APELACIONES AL DETERMINAR QUE EN VIRTUD DE LA PÓLIZA SOMBRILLA EMITIDA POR UNIVERSAL ÉSTA ESTABA EN LA OBLIGACIÓN DE ASUMIR LA POSICIÓN DEL ASEGURADOR PRIMARIO INSOLVENTE DE CONFORMIDAD CON LA TEORÍA DE DESCENSO DE NIVEL ("DROP DOWN").

3. ERRÓ EL TRIBUNAL DE APELACIONES AL DETERMINAR QUE EN EL PRESENTE CASO UNIVERSAL INCURRIÓ EN TEMERIDAD.

Alega Universal que los hechos presentes en este caso no dan margen a cubierta o, en la alternativa, están sujetos a exclusión conforme a lo provisto en los términos y condiciones de la póliza emitida a favor de CBI. Universal sostiene que la reclamación iniciada por Maderas Tratadas se halla fundamentada estrictamente en una violación de las obligaciones contractuales asumidas por CBI, asunto que está expresamente excluido del seguro en cuestión por no constituir una ocurrencia ("occurrence"), según dicho término aparece definido en la póliza.

Con el propósito de dirimir el error que antecede según esbozado por Universal, comenzamos por examinar el marco doctrinal atinente al campo de seguros, con especial énfasis al término ocurrencia, según incorporado a la póliza sombrilla emitida por Universal.

## III

## EL CONTRATO DE SEGURO

Reiteradamente hemos destacado que en nuestra sociedad el negocio de seguros está revestido de un alto interés público debido a su importancia, complejidad y efecto en la economía y la sociedad, razón por la cual ha sido ampliamente reglamentado por el Estado. S.L.G. Ortiz-Alvarado v. Great American, 182 D.P.R. 48 (2011); Jiménez López *et al.* v. SIMED, 180 D.P.R. 1 (2010); S.L.G. Francis-Acevedo v. SIMED, 176 D.P.R. 372 (2009).

El seguro juega un papel económico crucial tanto a nivel individual como en el ámbito comercial, ya que permite igualmente a las personas, como a los negocios, proteger sus recursos al transferir el impacto monetario de ciertos riesgos a cambio del pago de una prima.[3] L. Benítez de Lugo y Reymundo, El Riesgo Jurídico, Madrid, Imp. Viuda Galo Sáez, 1961, pág. 17.

La póliza configura el documento escrito donde se plasman los términos que rigen el contrato de seguro. Éste se ha descrito como aquel pacto que suscriben las partes a través del cual "el asegurador, se compromete, a cambio del pago de una prima, a indemnizar a un tercero,

---

[3] El término aparece definido de la siguiente forma en el Artículo 1 del Código de Seguros:

*Seguro* - Es el contrato mediante el cual una persona se obliga a indemnizar a otra o a pagarle o a proveerle un beneficio específico o determinable al producirse un suceso incierto previsto en el mismo….

26 L.P.R.A. sec. 102 (2008).

por lo general al asegurado o un reclamante, por una pérdida contingente al ocurrir un evento futuro incierto previsto". R. Cruz, Derecho de Seguros, San Juan, Pubs. JTS, 1999, pág. 387. Similar a todo contrato, sus términos constituyen la ley entre las partes. S.L.G. Ortiz-Alvarado v. Great American, *supra*; Jiménez López *et al.* v. SIMED, *supra*; S.L.G. Francis-Acevedo v. SIMED, *supra.*

El propio Código de Seguros pauta la norma que ha de regir en el descargo de nuestra función interpretativa de las cláusulas contenidas en una póliza de seguro. A esos efectos, dicho cuerpo normativo dispone que "[t]odo contrato de seguro deberá interpretarse globalmente, a base del conjunto total de sus términos y condiciones, según se expresen en la póliza y según se hayan ampliado, extendido, o modificado…". Artículo 11.250, 26 L.P.R.A. sec. 1125 (2008). Véase, además, Jiménez López *et al.* v. SIMED, *supra*; Echandi Otero v. Stewart Title, 174 D.P.R. 355 (2008); Monteagudo Pérez v. E.L.A., 172 D.P.R. 12 (2007).

Por tanto, los principios generales de hermenéutica atinentes a los contratos, según esbozados en los Artículos 1233 a 1241 del Código Civil, 31 L.P.R.A. secs. 3471-3479 (1990), se utilizarán únicamente de manera supletoria. Jiménez López *et al.* v. SIMED, *supra*; Echandi

Otero v. Stewart Title, *supra*; Molina v. Plaza Acuática, 166 D.P.R. 260 (2005).

En aquellos casos en que surjan dudas en torno a la interpretación de los términos de una póliza, éstas deben resolverse de manera que se cumpla con el designio intrínseco de la misma, es decir, proveer protección al asegurado. S.L.G. Francis-Acevedo v. SIMED, *supra*; Quiñones López v. Manzano Pozas, 141 D.P.R. 139 (1996).

Como parte del proceso de examinar los términos, consignados en el acuerdo, los tribunales vienen obligados a considerar los vocablos utilizados a base de su acepción cotidiana según lo haría un ciudadano de inteligencia promedio interesado en obtener una póliza de seguro. Quiñones López v. Manzano Pozas, *supra*; S.L.G. Ortiz-Alvarado v. Great American, *supra*; S.L.G. Francis-Acevedo v. SIMED, *supra.*

Cónsono con lo anterior y similar al proceso de interpretación de las leyes, se examinarán las palabras contenidas en la póliza "en su más corriente y usual significación, sin atender demasiado al rigor de las reglas gramaticales, sino al uso general y popular de las voces". Artículo 15 del Código Civil, 31 L.P.R.A. sec. 15 (1993). S.L.G. Ortiz-Alvarado v. Great American, *supra*; Jiménez López *et al.* v. SIMED, *supra*; Molina v. Plaza Acuática, *supra*; Quiñones López v. Manzano Pozas, *supra*.

Como regla general, las disposiciones de un contrato de seguro deben de ser interpretadas liberalmente a favor del asegurado por constituir éste un contrato de adhesión.[4] S.L.G. Ortiz-Alvarado v. Great American, *supra*; S.L.G. Francis-Acevedo v. SIMED, *supra*; Echandi Otero v. Stewart Title, *supra*; Monteagudo Pérez v. E.L.A., *supra*; Quiñones López v. Manzano Pozas, *supra*.

No obstante, este principio de hermenéutica no tendrá aplicación cuando las cláusulas en cuestión resulten claras y libres de ambigüedad. En tales casos, se hará valer la clara voluntad de las partes y el asegurado vendrá obligado por los términos allí manifestados. S.L.G. Ortiz-Alvarado v. Great American, *supra*; Jiménez López *et al.* v. SIMED, *supra*; S.L.G. Francis-Acevedo v. SIMED, *supra*.

Los términos de un contrato se reputan claros "cuando por sí mismos son bastante lúcidos para ser entendidos en un único sentido, sin dar lugar a dudas, controversias ni diversidad de interpretaciones y sin necesitar para su comprensión razonamientos o demostraciones susceptibles de impugnación". S.L.G. Francis-Acevedo v. SIMED, *supra,* pág. 387 (cita y comillas omitidas).

De otra parte, cabe notar que las cláusulas de exclusión, que operan para limitar la cubierta provista

---

[4] Se entiende por contrato de adhesión aquel en que una de las partes dicta las condiciones atinentes al contrato viniendo la otra parte obligada a aceptarlas por no contar con potestad alguna para variarlas. S.L.G. Francis-Acevedo v. SIMED, 176 D.P.R. 372, 386 (2009); López v. Atlantic Southern Ins. Co., 158 D.P.R. 562, 568 n. 2 (2003); Quiñones López v. Manzano Pozas, 141 D.P.R. 139, 155 n. 17 (1996).

por la aseguradora y, de este modo, no responder por determinados eventos, riesgos o peligros, son generalmente desfavorecidas. Así pues, éstas serán interpretadas restrictivamente en contra del asegurador para, de este modo, cumplir con el propósito intrínseco de la póliza, es decir, dar mayor protección al asegurado. Jiménez López *et al.* v. SIMED, *supra*; S.L.G. Francis-Acevedo v. SIMED, *supra*; Echandi Otero v. Stewart Title, *supra*; Monteagudo Pérez v. E.L.A., *supra*.

No obstante, si las cláusulas de exclusión son claras y aplican a determinada situación, la aseguradora no será responsabilizada por aquellos riesgos expresamente excluidos. Jiménez López *et al.* v. SIMED, *supra*; Echandi Otero v. Stewart Title, *supra*; Molina v. Plaza Acuática, *supra*.

## A. TIPOS DE SEGURO

Entre los diferentes tipos de seguro se distinguen, por un lado, aquellos que van dirigidos a resguardar aspectos personales o pérdidas a la propiedad del propio asegurado, a diferencia de los seguros que le ofrecen protección frente a reclamaciones instadas en su contra por terceros que han sufrido daños por su causa. Couch on Insurance 3d, Vol. 9A, sec. 129:1, págs. 129-5 – 129-6 (12/2005); New Appleman on Insurance Law Library Edition, Vol. 3, sec. 16.02[2], pág. 16-28 (Rel. 5-9/2011). Esta última modalidad, conocida como seguro de responsabilidad

civil o pública, "'tiene [] como fin primordial garantizar al asegurado contra la responsabilidad civil en que pueda incurrir ante terceros por actos de los que sea legalmente responsable'". Quiñones López v. Manzano Pozas, *supra,* pág. 153 (citando a J. Castelo Matrán, Diccionario Mapfre de Seguros, Ed. Mapfre, 1988, pág. 264) (corchetes omitidos); Meléndez Piñero v. Levitt & Sons of P.R., *supra.* En otras palabras, el asegurador se compromete, conforme a las condiciones estipuladas en el contrato, a indemnizar a un tercero por aquellos daños y perjuicios que le ha causado el asegurado.

Evidentemente, un seguro no responde por toda gestión imaginable del asegurado que pueda causar daño a terceros. La cubierta se circunscribe a determinadas actividades específicamente delimitadas en la póliza conjuntamente con las exclusiones allí dispuestas, donde se exceptúan ciertas actividades por las que no viene obligado a indemnizar. Meléndez Piñero v. Levitt & Sons of P.R., *supra*.

Existen a su vez seguros que operan a diferentes niveles para, de este modo, expandir el monto de la cobertura disponible a un asegurado dependiendo de la magnitud del riesgo que se interesa proteger. Con este fin, se encuentran tanto la póliza en exceso como la póliza sombrilla. Ambas tienen como función cubrir

riesgos que excedan la cubierta provista por pólizas primarias.

El seguro primario provee cubierta inicial y, como regla general, se activa tan pronto sobreviene una contingencia contemplada en la póliza. La póliza en exceso, por su parte, provee cubierta por encima de los límites de responsabilidad establecidos en el seguro primario y la obligación de pago no surge hasta que se hayan agotado los límites dispuestos en la póliza primaria correspondiente. Monteagudo Pérez v. E.L.A., *supra*; B. R. Ostrager y T. R. Newman, Handbook on Insurance Coverage Disputes, 10ma ed., Nueva York, Aspen Law & Business, 2000, sec. 603[a], págs. 292-293.

De otra parte, el término póliza sombrilla se utiliza típicamente en el contexto de las pólizas de responsabilidad civil. En sus efectos resulta similar a la póliza en exceso, en tanto y en cuanto proporciona cubierta adicional a la provista por la póliza primaria por aquellas pérdidas que excedan sus límites. New Appleman on Insurance Law Library Edition, Vol. 1, sec. 1.06[7], pág. 1-61 (Rel. 3-9/2010).

No obstante, su alcance es más amplio que el de una póliza en exceso en la medida en que, contrario a ésta, puede extenderse a riesgos no cubiertos por la póliza subyacente. New Appleman on Insurance Law Library Edition, Vol. 1, sec. 1.06[7], pág. 1-61 (Rel. 3-9/2010);

Appleman on Insurance Law Library Edition, Vol. 3, sec. 16.02[3][d][i], pág. 16-38 (Rel. 5-9/2011); New Appleman on Insurance Law Library Edition, Vol. 4, sec. 24.02[3], págs. 24-16.1-24-17 (Rel. 6-12/2011); Ostrager, op. cit., sec. 6.03[a], págs. 292-294.

El caso que nos ocupa gira en torno a una póliza tipo sombrilla emitida por Universal, la cual provee cubierta de hasta un millón de dólares ($1,000,000.00). No obstante, la obligación de pago de Universal se encuentra supeditada al límite de un millón de dólares ($1,000,000.00) provisto por el seguro primario correspondiente a una póliza de responsabilidad general comprensiva emitida por IFC, declarada insolvente.

### B. OCURRENCIA ("OCCURRENCE")

Con el propósito de determinar si la aseguradora viene llamada a responder por la reclamación objeto de este recurso, debemos inicialmente examinar si los hechos, según decretados por el Tribunal de Primera Instancia y validados por el Tribunal de Apelaciones, se encuentran enmarcados dentro de la cubierta provista por el contrato de seguro con Universal. De ser así, corresponde entonces verificar si la responsabilidad de Universal se halla a su vez suprimida por alguna de las exclusiones contenidas en la póliza antes mencionada.

La póliza de seguro tipo "Commercial Umbrella Liability Policy" emitida por Universal dispone cubierta

por daños personales o a la propiedad de terceros, o sea, responsabilidad civil, causados por una ocurrencia ("occurrence").  Dicho término[5] se define en la póliza como "un **accidente,** incluyendo la exposición continua o repetida a condiciones que resultan en daños personales, daños a la propiedad… no anticipados ni intencionales **desde el punto de vista del asegurado".** (Traducción y énfasis nuestro).

La expresión "ocurrencia" en el contexto de las pólizas comerciales de responsabilidad civil o pública surge a partir del 1966.[6]  Originalmente, dichas pólizas típicamente proveían cubierta por daños causados por "accidentes".  No obstante, ello presentaba problemas en la práctica puesto que el alcance del seguro resultaba extremadamente limitado al circunscribir su aplicación a un evento súbito o abrupto.  Debido a las recurrentes disputas generadas sobre este particular, se reemplazó el término "accidente" por "ocurrencia" modificando así su enfoque para extender, de este modo, la cubierta a situaciones de daños progresivos o continuos.  Couch on Insurance 3d, Vol. 9A, sec. 129:3, págs. 129-9 – 129-10

---

[5]    La póliza, redactada en inglés, define "occurrence" de la siguiente manera: "an accident, including continuous or repeated exposure to conditions, which results in **personal injury, property damage**… neither expected nor intended from the standpoint of the **insured".**  (Énfasis en el original).

[6]    Estos términos corresponden a pólizas modelo desarrolladas por la industria de seguros de Estados Unidos a través de una organización denominada "Insurance Services Office" con el propósito de uniformar las condiciones de cubierta ofrecidas a través de sus productos.  Véase, New Appleman on Insurance Law Library Edition, Vol. 3 sec. 16.02[3][a][iii] pág. 16-29 (Rel. 5-9/2011).

(12/05); New Appleman on Insurance Law Library Edition,
Vol. 3, sec. 16.02[3][a][iv], págs. 16-30 – 16-31 (Rel. 5-
9/2011).

A pesar de que el nuevo concepto "ocurrencia" ofrece
una cubierta más amplia que la anteriormente provista por
el término "accidente", cabe señalar que, aun bajo la
nueva perspectiva se requiere que la conducta que da
origen a la reclamación sea una "accidental". Couch on
Insurance 3d, Vol. 9A, sec. 129:3, págs. 129-10 – 129-11
(12/05); New Appleman on Insurance Law Library Edition,
Vol. 3, sec. 16.07[3][a], pág. 16-177 (Rel. 5-9/2011).

Es por ello que, tal como sucede en la póliza ante
nuestra consideración, la palabra "accidental" se hace
constar taxativamente en la definición contemporánea de
"ocurrencia". Así pues, se ha indicado que el cambio en
el enfoque "no elimina la necesidad de que tenga lugar un
accidente". A. D. Windt, Insurance Claims and Disputes,
5ta ed., St. Paul, Minn., Thompson/West, 2007, sec. 11.3,
pág. 11-31 (2007) (traducción nuestra).

La expresión "accidente" ha de ser interpretada
conforme su significado común y ordinario. Para efectos
de la definición de "ocurrencia", ello denota un incidente
o evento **no planificado, no intencional, no anticipado, o
imprevisto**. Couch on Insurance 3d, Vol. 9A, sec. 129:3,
pág. 129-11 (12/2005).

> It has been said that an accident is merely
> an unanticipated event; it is that which occurs

> not as the result of natural routine, but as the culmination of forces working without design, coordination, or plan. In other words, damage that is the natural, ordinary, probable, or expected result of an insured's action is not damage that was caused by an occurrence.

Windt, op. cit., sec. 11.3, págs. 11-32 - 11-33 (notas al calce omitidas).

Conforme a lo anterior, queda claro que la conducta deliberada o intencional no constituye un "accidente" ni una "ocurrencia". Windt, op. cit., pág. 11-43.

Para propósitos de determinar si, en efecto, el suceso que da margen a los daños constituye un accidente, es menester examinar el comportamiento que da base a la reclamación desde el punto de vista del asegurado. Ello aparece consignado expresamente en la definición de "ocurrencia" que obra en la póliza transcrita anteriormente. Cónsono con lo anterior, hemos reconocido que "el concepto *ocurrencia* (*occurrence*), no provee cubierta por actos culposos e intencionales del propio asegurado". PFZ Props., Inc. v. Gen. Acc. Ins. Co., 136 D.P.R. 881, 904 (1994) (énfasis en el original).

No obstante, cabe distinguir entre la conducta intencional del asegurado y aquellos daños físicos o daños a la propiedad que no fueron anticipados por éste, ni tampoco tuvo la voluntad expresa de causarlos. Quiere esto decir que, independientemente de la voluntariedad atinente al comportamiento que trajo como consecuencia los daños, lo determinante es auscultar si dichas secuelas

eran igualmente deseadas por el asegurado. PFZ Props., Inc. v. Gen. Acc. Ins. Co., *supra*. Véase, además, Ostrager, op. cit., sec. 8.03[b], págs. 433-436.

Una mayoría de las jurisdicciones en los Estados Unidos ha resuelto que la violación de contrato no constituye una ocurrencia.[7] Esta norma responde a que con este tipo de póliza se persigue cubrir únicamente aquellos eventos que sean fortuitos e inesperados y no los resultados previstos de conducta deliberada del asegurado. Couch on Insurance 3d, Vol. 9A, sec. 129:3, págs. 129-12 – 129-13 (12/2005). Una póliza comercial de responsabilidad civil o pública está diseñada y pretende proveer cubierta por responsabilidad extracontractual por los daños ocasionados a terceras personas o a la propiedad de éstos. No cobija por responsabilidad contractual que únicamente ocasione daños económicos sin afectar a personas o propiedad ajena. Íd. sec. 129:3, pág. 129-13 (12/2005). Por ende, como regla general, aquellas reclamaciones basadas en la negligencia del asegurado se han considerado como comprendidas dentro del término ocurrencia. Couch on Insurance 3d, Vol. 7A, sec. 103:19, pág. 103-46 (12/1997).

Coincidimos con esta apreciación sobre el alcance de la póliza emitida por Universal en este recurso.

---

[7] Ya anteriormente reconocimos la utilidad y el valor persuasivo de la interpretación conferida por la jurisprudencia federal y estatal de Estados Unidos a las pólizas modelo mercadeadas en Puerto Rico. Molina v. Plaza Acuática, 166 D.P.R. 260, 266 (2005); Guerrido García v. U.C.B., 143 D.P.R. 337, 346-347 (1997); Meléndez Piñero v. Levitt & Sons of P.R., 129 D.P.R. 521, 535 (1991).

Arribamos a esta conclusión a base de la definición del término ocurrencia allí consignado, conjuntamente con la naturaleza particular de la póliza de responsabilidad civil.

Nuestro dictamen se encuentra igualmente sustentado por el lenguaje de la póliza de Universal a los efectos de que la aseguradora se obliga a satisfacer aquellas sumas que el asegurado venga legalmente obligado a pagar por aquella responsabilidad impuesta por ley.[8] Esta cláusula ha sido interpretada como que limita la cubierta únicamente a la esfera de daños extracontractuales y no a daños resultantes por violación de contrato. Windt, op. cit., sec. 11.7, pág. 1-136; López & Medina Corp. v. Marsh U.S.A., Inc., 667 F.3d 58 (1er Cir. 2012).

## IV

### A. NEGLIGENCIA – ARTÍCULOS 1802 Y 1803

La responsabilidad extracontractual se encuentra reglamentada por el Artículo 1802 del Código Civil, 31 L.P.R.A. sec. 4151 (1990) (Artículo 1802), el cual dispone

---

[8]  La póliza emitida por Universal en este caso dispone lo siguiente en su parte pertinente:

> In consideration of the payment of the required premium, the Company hereby agrees, subject to all of the terms of this policy, to **pay on behalf of the insured all sums**, as more fully defined by the term ultimate net loss, **for which the insured shall become obligated to pay by reason of liability**
>
> (a)    **imposed upon the insured by law** or
>
>                         ....

(Énfasis nuestro y énfasis original omitido).

que "[e]l que por acción u omisión causa daño a otro, interviniendo culpa o negligencia, está obligado a reparar el daño causado". Este precepto contempla las obligaciones que surgen como resultado de actos u omisiones propios. No cabe duda de que la responsabilidad civil impuesta por dicho estatuto incluye, no sólo las acciones culposas, sino igualmente las omisiones cuando existe un deber jurídico de actuar y de haberse realizado el acto omitido se hubiera evitado el daño. Hernández Vélez v. Televicentro, 168 D.P.R. 803 (2006).

De otra parte, a diferencia de la obligación de reparar daños por acciones u omisiones propios, el Artículo 1803, 31 L.P.R.A. sec. 5142 (1990) (Artículo 1803),[9] extiende dicho deber reparador a los actos y omisiones de otras personas por las que la ley exige que se debe responder. S.L.G. Vázquez-Ibáñez v. De Jesús, Vélez, 180 D.P.R. 387, 405 (2010). En otras palabras, el mencionado precepto impone responsabilidad por hechos ajenos motivados por diferentes tipos de relaciones como

---

[9]    El Artículo 1803 provee en lo pertinente lo siguiente:

> La obligación que impone [el Artículo 1802] es exigible, no sólo por los actos u omisiones propios, sino por los de aquellas personas de quienes se debe responder.

> ....

> Lo son igualmente los dueños o directores de un establecimiento o empresa respecto de los perjuicios causados por sus dependientes en el servicio de los ramos en que los tuvieran empleados, o con ocasión de sus funciones.

> ....

> La responsabilidad de que trata esta sección cesará cuando las personas en ella mencionadas prueben que emplearon toda la diligencia de un buen padre de familia para prevenir el daño.

lo es la de un patrono respecto de sus empleados. El estatuto igualmente establece una presunción de culpa por parte de las personas allí designadas. No obstante, se admite la presentación de prueba en contrario para evitar, de este modo, la imposición de responsabilidad de naturaleza vicaria.

La causa de acción instaurada por el Artículo 1803 consiste fundamentalmente en la culpa *in vigilando* o *in eligiendo* atribuible a las personas designadas estatutariamente como responsables. J. Santos Briz, La Responsabilidad Civil, 7ma ed., Madrid, Ed. Montecorvo, S.A., 1993, pág. 483. Se establece, pues, una presunción de culpa que puede consistir en una falta de vigilancia "o en una desacertada elección (*culpa in eligiendo*)". J. Castán Tobeñas, Derecho Civil Español, Común y Foral, 15ª Ed., Madrid, Ed. Reus, S.A., 1993, T. IV, pág. 973. "En general se dice que es una responsabilidad fundada en la presunción *iuris tantum* de culpa propia, por la falta de vigilancia o de cuidado en la elección de las personas." J. Puig Brutau, Fundamentos de Derecho Civil, Barcelona, Ed. Bosch, T. II, Vol. III, 1983, pág. 106.

### B. INCUMPLIMIENTO DE OBLIGACIÓN – ARTÍCULO 1057

En lo atinente a la relación contractual, una vez perfeccionado un contrato surge la obligación de cumplir con las debidas prestaciones según pactadas por las partes so pena de responder por los daños ocasionados por tal

inobservancia.  A esos efectos, el Artículo 1210 del Código Civil, 31 L.P.R.A. sec. 3375 (1990), dispone:

> Los contratos se perfeccionan por el mero consentimiento, y desde entonces obligan, no sólo al cumplimiento de lo expresamente pactado, sino también a todas las consecuencias que según su naturaleza, sean conformes a la buena fe, al uso y a la ley.

"Culpa contractual, pues, es la que surge del incumplimiento de las obligaciones que han convenido los contratantes.  Éstos han establecido unas normas que se han obligado a cumplir, y de su incumplimiento, cuando es imputable a uno de ellos surge la culpa."  A. Borrell Macia, Responsabilidades Derivadas de Culpa Extracontractual Civil, 2da ed., Barcelona, Ed. Bosch, 1958, pág. 75.

Conforme el mandato fijado en el Artículo 1057 del Código Civil, 31 L.P.R.A. sec. 3021 (1990),[10] se le exige al deudor la debida diligencia en el desempeño de la obligación en todos sus aspectos.  Así pues, para efectos de esta disposición:

> [E]s fundamental la naturaleza de la obligación (propiamente, de la prestación), pues ésta es la que "exige" la diligencia debida…. El resultado es un trato totalmente riguroso para el deudor,

---

[10]   El Artículo 1057 dispone como sigue:

> La culpa o negligencia del deudor consiste en la omisión de aquella diligencia que exija la naturaleza de la obligación y corresponda a las circunstancias de las personas, del tiempo y del lugar.

> Cuando la obligación no exprese la diligencia que ha de prestarse en su cumplimiento, se exigirá la que correspondería a un buen padre de familia.

el cual deberá emplear toda la diligencia necesaria y suficiente (sea ésta cual sea), para que la obligación quede definitivamente cumplida. La intensidad de la diligencia… está presidida por la efectiva realización material del cumplimiento debido….

J. L. Lacruz Berdejo, Elementos de Derecho Civil, II Derecho de Obligaciones, 4ta ed., Madrid, Ed. Dykinson, Vol. I, 2007, pág. 169.

## C. DIFERENCIA ENTRE VIOLACIÓN CONTRACTUAL Y EXTRACONTRACTUAL

Las acciones *ex delito* surgen del incumplimiento de la regla cardinal en la que descansa la sana convivencia humana: el no causar daño a los demás, o principio de *alterum non laedere*. Las mismas se encuentran preceptuadas en el Artículo 1802 y se distinguen porque la responsabilidad frente al perjudicado surge sin que le preceda una relación jurídica entre las partes concernidas. E.L.A. v. Soto Santiago, 131 D.P.R. 304, 313 (1992); Ramos v. Orientalist Rattan Furnt., Inc., 130 D.P.R. 712, 726 (1992). "[L]a responsabilidad civil entra en juego cuando una persona causa un daño ilícito a otra, con la que no está ligada por una relación jurídica previa." R. de Ángel Yagüez, La Responsabilidad Civil, Bilbao, Universidad de Deusto, pág. 24 (nota al calce omitida).

De otra parte, las acciones *ex contractus*, mediante las cuales se reclaman daños derivados del incumplimiento de contratos y pautadas en el Artículo 1054 del Código

Civil, 31 L.P.R.A. sec. 3018 (1990),[11] se refieren a actos u omisiones voluntarios que conllevan la inobservancia de obligaciones anteriormente acordadas. Según hemos indicado en otras ocasiones, estas reclamaciones tienen por objeto el que se cumplan las promesas contractuales sobre las cuales las partes prestaron su consentimiento. Trinidad v. Chade, 153 D.P.R. 280, 290 (2001); Ramos v. Orientalist Rattan Furnt., Inc., *supra*; Santiago Nieves v. A.C.A.A., 119 D.P.R. 711, 716 (1987). Se exige, por lo tanto, que al daño le preceda una relación jurídica entre las partes concernidas. Alvarez v. Rivera, 165 D.P.R. 1, 18 (2005); Trinidad v. Chade, *supra*; Ramos v. Orientalist Rattan Furnt., Inc., *supra*; Prieto v. Maryland Casualty Co., 98 D.P.R. 594, 619 (1970).

A tales efectos, el Tribunal Supremo de España ha expresado: "para que opere la responsabilidad contractual, con exclusión de la extracontractual o aquiliana, no basta que haya un contrato entre las partes, sino que se requiere la realización de un hecho dentro de la rigurosa órbita de lo pactado y como desarrollo del contenido negocial". De Ángel Yagüez, op. cit., pág. 27.

Así pues, se resume la esencia de cada una de estas dos (2) acciones de la siguiente manera:

---

[11]  El Artículo 1054 dispone lo siguiente:

Quedan sujetos a la indemnización de los daños y perjuicios causados, los que en el cumplimiento de sus obligaciones incurrieren en dolo, negligencia o morosidad, y los que de cualquier modo contravinieren al tenor de aquéllas.

> [Ú]nicamente procede la acción en daños contractuales (Art. 1054) cuando el daño sufrido **exclusivamente** surge como consecuencia del incumplimiento de una obligación específicamente pactada, **daño que no ocurriría sin la existencia del contrato.** Ahora bien, resolvemos que resulta procedente una reclamación de daños extracontractuales como resultado del quebrantamiento de un contrato, si el hecho causante del daño constituye una violación del deber general de no causar daño a otro, y, a la vez, incumplimiento contractual.

Ramos v. Orientalist Rattan Furnt., Inc., *supra*, pág. 727 (énfasis nuestro y nota al calce omitida).

No cabe duda, sin embargo, que una misma conducta puede dar origen a dos (2) tipos de causa de acción diferentes; una fundamentada en el concepto de negligencia y la otra cimentada en las obligaciones contraídas mediante un acuerdo previo. Así lo reconocimos expresamente en Ramos v. Orientalist Rattan Furnt., Inc., *supra*, al validar la teoría de la concurrencia de acciones de resarcimiento derivadas de un contrato y a la vez de un acto ilícito extracontractual. Véase, además, Martínez Marrero v. González Droz, 180 D.P.R. 579, 592 (2011).

Para que opere la misma deben coincidir los siguientes requisitos:

1. Que el hecho causante del daño sea al mismo tiempo incumplimiento de una obligación contractual y violación del deber general de no causar daño a otro, es decir, violación de un deber con abstracción de la obligación contractual que se daría aunque ésta no hubiere existido.

2. El perjudicado por efecto de la doble infracción (contractual y delictual) ha de ser

la misma persona, es decir, el acreedor
contractual….

3. Por último, es también necesario que la doble
infracción haya sido cometida por una misma
persona, el deudor contractual….

Ramos v. Orientalist Rattan Furnt., Inc., *supra*, pág. 725
(citando a Santos Briz, op. cit.).

Nuestro Código Civil, trazando las disposiciones de
su contraparte español, preceptúa los daños que conciernen
a cada una de estas modalidades[12] las cuales "responden a
un principio común de derecho y a una finalidad
reparadora". Ramos v. Orientalist Rattan Furnt., Inc.,
*supra*, pág. 722.

Queda claro, no obstante, que no procede la
indemnización conjunta por ambos tipos de acción, puesto
que ello conllevaría una duplicidad de remedios. El
resarcimiento procederá únicamente por una sola de las
reclamaciones. Corresponde, por lo tanto, al perjudicado,
optar por una de las dos (2) vías alternas para obtener la
reparación satisfactoria a sus daños. Ramos v.
Orientalist Rattan Furnt., Inc., *supra*.

**D.**

Universal sostiene que la póliza sombrilla no provee
cubierta para los hechos presentes en este recurso por
tratarse de una reclamación cimentada en un incumplimiento

---

[12] Véase el Artículo 1802, atinente a los daños causados por negligencia,
y el Artículo 1054 que dispone para daños por el incumplimiento de las
obligaciones contractuales.

de contrato. La aseguradora aduce que, contrario a la determinación recurrida, la Demanda instada por Maderas Tratadas y el señor Fernández meramente plantea el que CBI infringió las obligaciones contraídas mediante el acuerdo suscrito entre las partes, al no proveer servicios de seguridad apropiados. Es decir, al no haber escogido ni supervisado adecuadamente los guardias de seguridad asignados a velar por la seguridad de Maderas Tratadas según pactado, lo cual ocasionó los daños exigidos mediante la presente acción judicial.

Para efectos de dilucidar la presente controversia, los hechos que dan margen a la Demanda instada por Maderas Tratadas y el señor Fernández son relativamente sencillos. Un empleado de CBI hurtó y/o permitió a otros sustraer propiedad de Maderas Tratadas mientras fungía como guardia de seguridad del lugar. Se estableció mediante juicio que la sustracción de mercancía se debió a la negligencia desplegada por el patrono, en este caso la compañía de seguridad, al no implementar sistema alguno para evaluar y monitorear a sus empleados. La pregunta obligada que surge entonces es si el deber de reparar ese daño surge única y exclusivamente como consecuencia de la relación contractual existente entre Maderas Tratadas y CBI o si existe al mismo tiempo una obligación de indemnizar como parte de las normas habituales de respeto a los demás, independiente de cualquier relación jurídica previa. Es

decir, el deber general de no causar daño a otros implementado a través de las pautas de responsabilidad vicaria consignadas en el Artículo 1803.

Para poder responder al planteamiento de Universal debemos examinar en primera instancia las alegaciones contenidas en la Demanda y de este modo indagar la naturaleza de las reclamaciones presentadas por Maderas Tratadas y el señor Fernández en contra de CBI. En el epígrafe de la Demanda se identifica la materia de los asuntos allí **presentados** como "incumplimiento de contrato y daños y perjuicios". En la misma se le imputa a CBI tanto negligencia *in eligiendo*, así como *in vigilando* en relación a sus empleados lo que, según se alega, trajo como consecuencia directa el que se concretara el hurto. Igualmente, se mencionan los daños acaecidos como resultado de tal negligencia. Es decir, se delinearon los elementos básicos para una reclamación en daños y perjuicios a través del Artículo 1803. Paralelamente se hace mención del incumplimiento con las disposiciones contractuales del trabajo a ser llevado a cabo por la compañía de seguridad.

Conforme al Artículo 1803, se alude a la culpa *in eligiendo,* así como a la modalidad *in vigilando* como causa próxima de los daños. Igualmente, se consignó la contravención con las disposiciones contractuales al incumplirse con las normas atinentes al tipo de trabajo

contratado. Podemos concluir, por lo tanto, que desde los inicios del caso figuró la concurrencia de acciones. Se hizo mención de la identidad entre el causante del daño y el perjudicado. De otra parte, la conducta imputada dio margen al mismo tiempo a una acción por incumplimiento de una obligación contractual y a la violación del deber general de no causar daño a otro a través de la responsabilidad vicaria.

A base de ello, quedaba a la discreción de la parte perjudicada escoger cuál de las dos (2) vías indemnizatorias le resultaba más conveniente proseguir para vindicar sus derechos.

Una vez examinados los hechos, según la prueba que le mereció credibilidad, el Tribunal de Primera Instancia dictaminó que la acción ejercitada por Maderas Tratadas y el señor Fernández estaba predicada esencialmente en los Artículos 1802 y 1803 del Código Civil. Encontró que hubo negligencia por parte de CBI al no supervisar sus guardias de seguridad ni ejercer el debido cuidado al emplearlos, por lo que, acorde con lo dispuesto en el Artículo 1803, venía obligado a responder por los daños sufridos por Maderas Tratadas y el señor Fernández.

El Tribunal de Apelaciones, por su parte, reconoció que la determinación apelada "declaró con lugar la demanda en daños y perjuicios" y como parte de su Sentencia, analizó el derecho aplicable desde el punto de vista de

los Artículos 1802 y 1803.  A esos efectos, decretó lo

siguiente:

> Realmente, la negligencia aquí estriba en escoger mal, entrenar mal y no supervisar a guardias de seguridad que se contratan para precisamente hacer lo contrario a lo que aquí realizó el guardia Sr. Gonzalez. CBI incumplió, a su deber "*in eligiendo*", *Ortiz v. Scn. Serrallés*, 89 DPR 419 (1963), como en su deber de supervisión y entrenamiento continuo, ante el riesgo latente de que el guardia de seguridad no actúe conforme de él se espera.  CBI es, precisamente una empresa dedicada a prestar servicios de vigilancia a terceros.  Además, tratándose de vigilancia nocturna y en días feriados, es previsible que si no se emplean medidas cautelares necesarias ocurra lo que sucedió. *Martínez v. Chase Manhattan Bank*, 108 DPR 515 (1979).

Sentencia del Tribunal de Apelaciones, págs. 16 y 17.

Al igual que el Tribunal de Primera Instancia, el Tribunal de Apelaciones dispuso que CBI respondía vicariamente al no tomar precauciones en el proceso de contratar sus guardias de seguridad y al permitirles llevar a cabo sus funciones sin ningún tipo de control. Resolvió, por ende, que CBI era llamado a satisfacer los daños ocasionados por su empleado al robar o permitir el hurto de mercancía de aquél a quien venía obligado a proteger.

Evaluada las determinaciones del tribunal *a quo* no encontramos razón de peso para interpretarlas de otro modo. Por tanto, para efectos de la póliza emitida por Universal en este recurso, la responsabilidad del asegurado frente a Maderas Tratadas y el señor Fernández

se encuentra sustentada por los Artículos 1802 y 1803 del Código Civil. Es decir, por los preceptos atinentes a la responsabilidad extracontractual.

Nuestro próximo paso se reduce a determinar si la negligencia desplegada por CBI en este caso puede enmarcarse dentro de la definición de ocurrencia de la póliza que exige conducta no intencional. Respondemos en la afirmativa.

Según mencionamos anteriormente, Universal aduce que las alegaciones se reducen al incumplimiento de la obligación contractual asumida por CBI con Maderas Tratadas que de ninguna manera pueden ser catalogadas como un accidente o una ocurrencia cubierta por la póliza. A estos efectos indica que no existe cubierta por no tratarse de una ocurrencia o un accidente con consecuencia hacia terceras personas.

No obstante, como ya explicáramos, en ningún momento concluyó el tribunal *a quo* que la reclamación probada constituía una violación de contrato. Tampoco aparece evidencia de que la omisión desplegada por CBI en relación al escogido y supervisión de sus empleados fuese una intencional o que CBI actuase con el propósito deliberado de causar daños a la propiedad de Maderas Tratadas. Cabe recordar que para efectos de este caso, conforme a la propia definición de ocurrencia, debemos examinar la

conducta impugnada desde la perspectiva del asegurado, no de su empleado.

A base de lo anteriormente expuesto, ciertamente podemos concluir que los hechos según consignados por el tribunal juzgador caen dentro de los parámetros de la definición de ocurrencia. Tanto el Tribunal de Primera Instancia como el Tribunal de Apelaciones hallaron a CBI negligente conforme a los Artículos 1802 y 1803, por no ejercer el debido cuidado al emplear sus guardias de seguridad y al no supervisarlos adecuadamente. No estamos, por consiguiente, ante una determinación basada en violación de las obligaciones contractuales que surgieron como parte del contrato otorgado entre CBI y Maderas Tratadas. Tampoco aparece evidenciada conducta intencional de parte del asegurado actuando con el propósito deliberado de causar daño.

Por el contrario, no cabe duda de que en la situación planteada en este recurso se concretan los elementos necesarios para una reclamación en daños y perjuicios, que a su vez emanan de conducta que puede ciertamente catalogarse como una ocurrencia.

## V

### EXCLUSIONES

Una vez establecido que existe cubierta para las reclamaciones interpuestas por Maderas Tratadas y el señor Fernández, conforme a los parámetros de la póliza

sombrilla de Universal, pasamos a considerar si, no obstante, es de aplicación alguna de las disposiciones excluyentes allí provistas. Ello conlleva examinar con particular atención el lenguaje utilizado en las cláusulas pertinentes, habida cuenta de que las limitaciones de cubierta son generalmente desfavorecidas y han de ser interpretadas restrictivamente en contra del asegurador. Únicamente se exceptuarán aquellos riesgos que así aparezcan expresamente preceptuados en el contrato de seguro.

Universal aduce que no proceden las reclamaciones interpuestas por Maderas Tratadas y el señor Fernández por encontrarse éstas sujetas a las exclusiones atinentes a los riesgos empresariales ("business risks"), así como a la correspondiente al "cuidado, custodia y control" de la propiedad que CBI vigilaba.

Pasamos entonces a evaluar ambas exclusiones individualmente con el propósito de auscultar su aplicación a los hechos según delimitados en este recurso.

## A. RIESGOS EMPRESARIALES ("BUSINESS RISKS")

Las pólizas comerciales de responsabilidad civil están diseñadas para proteger a los asegurados por pérdidas en sus gestiones de negocios. Normalmente se asocian dos (2) tipos de riesgos con los trámites comerciales: los de naturaleza torticera y los que surgen debido a que el negocio no cumple con sus obligaciones

contractuales. Un ejemplo del primero lo constituye un producto defectuoso que causa daños a propiedad o a individuos, y del segundo, lo sería un producto defectuoso que no funciona conforme a las garantías contractuales provistas por el manufacturero. Con el propósito de eximir a las aseguradoras de la responsabilidad contractual correspondiente a pérdidas económicas cuando el producto de su asegurado no satisface las debidas garantías, se desarrolló la exclusión de los "riesgos empresariales". R. C. Anzivino, The Economic Loss Doctrine: Distinguishing Economic Loss from Non-economic Loss, 91 Marq. L. Rev. 1081, 1112-1113 (Summer 2008). Véase, además, Windt, op. cit., sec. 11:10, pág. 11-198.

Esta exclusión opera bajo la premisa de que el asegurado ejerce el control sobre la calidad de su trabajo y no debe permitirse que, a través de su conducta intencional o temeraria, controle los riesgos cubiertos por la póliza. Se considera que este tipo de riesgo constituye parte integral de la gestión de hacer negocios, por lo que su costo debe reflejarse en el precio del producto y no en la prima del seguro. New Appleman Insurance Law Library Edition, Vol. 3, sec. 18.03[10][b], pág. 18-77 (Rel. 5-9/2011).

Por tanto, cónsono con lo anterior, una póliza comercial de responsabilidad civil que contiene la mencionada exclusión está diseñada para proveer cubierta

por responsabilidad torticera por daños a terceros, pero no por daños contractuales debido a que el producto del asegurado no cumplió con lo pactado. Couch on Insurance 3rd, Vol. 9-A, sec. 129.16, pág. 129-36 (12/2005).

> In order to provide coverage for tort liability and exclude coverage for contract liability, a number of "business risk" exclusions are included within the standard commercial general liability policy. These exist for the express purpose of excluding coverage for risks that relate to the repair or replacement of the insured's faulty work or products, or defects in the insured's work or products themselves. These "business risk" exclusions are designed to provide coverage for tort liability only, and not for the contractual liability of the insured for economic losses that occur because the product or completed work was not what the other party bargained for. A commercial general liability policy with its standard business risk exclusions provides insurers coverage for "property damage" that is tortious in nature, not contractual.

Anzivino, op. cit., págs. 1112-1113 (notas al calce omitidas).

Como parte de sus exclusiones, la póliza de Universal dispone:

> Section I of the Exclusions
> This policy shall not apply:
>> ....
>> C.   to property damage to
>>> (1)  **property owned by the insured**,
>>> (2)  the **insured's products** arising out of such products or any part of such products,
>>> (3)  **work performed b[y] or on behalf of the insured** arising out of the work or any portion thereof, or out of materials, parts or equipment furnished therewith;
>>> ....

(Énfasis nuestro y énfasis en el original omitido).

Las categorías antes reseñadas comprenden las tres (3) exclusiones que abarcan los "riesgos empresariales" comúnmente denominadas como: (1) "Exclusión de daños a la propiedad" ("Injury to property"); (2) "Exclusión de daños al producto" ("Injury to products exclusion") y, por último, (3) "Exclusión de daños al trabajo u obra realizada" ("Injury to work performed exclusion"). Véase, Meléndez Piñero v. Levitt & Sons of P.R., *supra*, pág. 542. Dichas disposiciones corresponden, respectivamente, a daños ocasionados, ya sea a los bienes, productos o al trabajo u obra realizados por el asegurado.

Como requisito indispensable para que se active la aludida exclusión debe darse un daño a la propiedad. Las primeras dos (2) exclusiones conciernen a daños a la propiedad acaecidos, ya sea a bienes del propio asegurado o a sus productos, por lo que no son de aplicación a los hechos presentes en este caso. Por último, se exceptúan daños a la propiedad que padezcan la obra o la labor realizados por el asegurado y sobrevenidos como resultado, ya sea de su trabajo o como consecuencia de los materiales, partes o equipos provistos en el desempeño de dicha faena. Este último supuesto atiende situaciones en que el trabajo llevado a cabo por el asegurado resulta deficiente ("faulty workmanship").

"De modo que cuando la obra o el producto del asegurado es defectuosa, el asegurador no responde por los daños que, precisamente, haya sufrido *en sí misma* la labor o bien del asegurado." Meléndez Piñero v. Levitt & Sons of P.R., *supra*, pág. 539 (énfasis en el original).

Cabe distinguir entre los defectos o vicios que sufra la obra realizada por el asegurado en sí, de los daños que pueda experimentar otro bien o propiedad como consecuencia de esos vicios. Meléndez Piñero v. Levitt & Sons of P.R., *supra.*

Ya anteriormente tuvimos la oportunidad de interpretar esta cláusula en el contexto de alegaciones sobre deficiencias en un proyecto de construcción y concluimos que su lenguaje no resulta ni ambiguo ni oscuro. Por el contrario, resolvimos que la misma "claramente informa: la póliza no cubre… los daños que padezca la obra realizada por el asegurado contratista como consecuencia de su trabajo". Meléndez Piñero v. Levitt & Sons of P.R., *supra*, pág. 541 (citas y corchetes omitidos).

Una vez evaluados los hechos relevantes a la controversia, encontramos que no resulta viable en este caso la aplicación de la tercera modalidad de la exclusión atinente a los riesgos empresariales, puesto que la labor en controversia concierne únicamente a la prestación de un servicio. Es decir, no pueden ocasionarse daños a la

labor o al trabajo realizados por CBI según requiere la "Exclusión de daños al trabajo u obra realizada" puesto que sus prestaciones estaban ceñidas únicamente a proteger la propiedad de Maderas Tratadas.  No nos encontramos frente a una situación en que el trabajo a cargo de CBI, que dio base a la reclamación, envolviese bienes tangibles como lo sería la construcción o manufactura de algún tipo de objeto fungible para poder concluir que, en efecto, se ocasionaron "daños al trabajo u obra realizada", por el asegurado.

A base de lo anterior, es forzoso concluir que las reclamaciones de Maderas Tratadas y el señor Fernández no se encuentran exceptuadas como uno de los riesgos empresariales identificados en las exclusiones de la póliza de Universal.

### B. CUIDADO, CUSTODIA Y CONTROL ("CARE, CUSTODY AND CONTROL")

Universal plantea, además, que en este caso las instalaciones de Maderas Tratadas se encontraban totalmente bajo la custodia y control de CBI cuando ocurrieron las apropiaciones ilegales.  Aduce que, a base de ello, se activó la cláusula de exclusión de responsabilidad sobre daños a toda propiedad que se hallare bajo el "cuidado, custodia, control o posesión del asegurado" ("care, custody or control exclusion").  Esta disposición elimina cubierta en aquellas situaciones en

que el asegurado guarda un vínculo tal con la propiedad afectada que le permite ejercer cierto grado de control sobre la misma. <u>PFZ Props., Inc. v. Gen. Acc. Inc. Co.</u>, *supra*. De este modo, se pretende evitar reclamos exagerados o falsos de su parte. <u>Íd.</u>

No obstante, hallamos que los casos citados por Universal en apoyo a su posición no son de aplicación a la situación que nos concierne. A diferencia de la disposición que figura en la póliza de este recurso, la jurisprudencia aludida por Universal gira en torno a la exclusión de "**propiedad**" que obra bajo el cuidado, custodia o control del asegurado.[13]

La cláusula correspondiente a la póliza en este caso se limita a "**dinero, valores, joyas u otros objetos de valor**" que constasen bajo el cuidado, custodia o control de CBI.[14] La exclusión se encuentra, por tanto, claramente circunscrita a ciertos bienes que denotan una naturaleza monetaria muy particular.

---

[13] Así pues, en <u>Stewart Warner Corp. v. Burns Int'l Sec. Serv., Inc.</u>, 527 F.2d 1025, 1027 (7mo Cir. 1975) la cláusula de exclusión se circunscribió a daños atinentes a "**property** in the care, custody or control of the insured" (énfasis nuestro). En <u>Employers Mut. Cas. Co. v. Trinity Universal Ins. Co.</u>, 376 S.W.2d 766, 767 (Tx. 1964) se exceptuó de cubierta "**property** rented to or in charge of the insured" (énfasis nuestro). Igualmente, en <u>Rogers v. British and Overseas Ins. Co., Ltd.</u>, 204 N.Y.S. 2d 42, 43 (1960) la póliza excluyó los siguientes daños: "[to] **property** used by or in the care, custody or control of the insured" (énfasis nuestro).

[14] El endoso Núm. 5 de la póliza emitida por Universal dispone:

CARE, CUSTODY OR CONTROL EXCLUSION

IT IS AGREED THAT THE COVERAGES AFFORDED BY THIS INSURANCE SHALL NOT APPLY TO **MONEY, SECURITIES, JEWELRY OR OTHER VALUABLES** IN THE CARE, CUSTODY OR CONTROL OF THE INSURED OR ENTRUSTED TO THE INSURED FOR SAFEKEEPING.

(Énfasis nuestro).

No cabe duda de que, ni el almacén custodiado por la asegurada, ni la parte del inventario sustraído de tales instalaciones puede ubicarse dentro de las categorías enumeradas en la referida exclusión. La propiedad afectada concierne únicamente a materiales de construcción y otras mercaderías que no implican de manera alguna los objetos de valor especificados en la póliza.

Consiguientemente, tampoco es de aplicación esta exclusión.

**VI**

**DESCENSO DE NIVEL ("DROP DOWN")**

Como próximo señalamiento, nos toca resolver si efectivamente la teoría de descenso de nivel ("drop down"), ratificada por el Tribunal de Apelaciones, es de aplicación a la póliza de Universal objeto de este recurso. La falta de capacidad económica de las aseguradoras para cumplir con sus obligaciones contractuales ha generado, a través de los años, un gran cúmulo de litigación concerniente a quién debe ser llamado a responder cuando una aseguradora primaria es declarada insolvente. Toca señalar que, en última instancia, la determinación de si debe o no obligarse a una aseguradora en exceso a bajar de nivel descansa enteramente en los términos que figuran en la póliza. Las respuestas a esta interrogante han generado resultados totalmente variados e inclusive inconsistentes entre sí. Véase, A. M. Samberg,

Note, Drop Down Liability of Excess Insurers for Insolvent Primary Carriers: the Search for Uniformity in Judicial Interpretation of Excess Insurance Policies, 33 Ariz. L. Rev. 239 (1991).

Utilizando como base nuestra primera opinión en el caso de A.A.A. v. Librotex, Inc., 141 D.P.R. 375 (1996), posteriormente revocada en reconsideración en A.A.A. v. Librotex, Inc., 142 D.P.R. 820 (1997) ("Librotex II"), el tribunal primario determinó que, no obstante su condición de sombrilla, la póliza emitida por Universal venía obligada a asumir la posición del asegurador primario insolvente, de conformidad con la teoría de descenso de nivel ("drop down"). El Tribunal de Primera Instancia razonó que, debido a que la póliza en controversia no contenía endosos ni lenguaje indicando lo contrario, se creaba una expectativa de cubierta, por lo que se presumía que operaba el descenso.

El Tribunal de Apelaciones por su parte, aunque reconoció que el enfoque del tribunal de instancia resultó errado, confirmó la determinación del tribunal a quo. Conforme su Sentencia, la aplicación de la norma antes aludida dependerá de: (1) que aparezca expresamente consignada la inclusión o la exclusión en la póliza o, en su defecto, (2) que ello se pueda inferir a base de la correlación entre la tarifa cobrada por el asegurador primario y la cobrada por el asegurador sombrilla. Al no

existir disposición expresa atinente al descenso, dicho foro optó por utilizar este último criterio y concluyó que procedía el descenso a base del monto de la prima pagada a Universal.

En nuestra opinión, en el caso de Librotex II validamos el principio de que, "[c]omo regla general, una aseguradora que provee cubierta en exceso no viene compelida a cubrir a un asegurado en sustitución de una aseguradora primaria declarada insolvente". Librotex II, pág. 824. Esta norma responde a la naturaleza particular de las cubiertas en exceso, en conjunción con la expectativa a la que advienen los contratantes al momento de pactar el monto de la prima por tales cubiertas. La expectativa de los contratantes en estas situaciones puede inferirse de la diferencia entre el monto de ambas primas, correlativo a los riesgos atinentes a cada tipo de póliza. Íd.

Únicamente cuando el lenguaje plasmado en el contrato de seguro resulta ambiguo, toca a los tribunales examinar, caso a caso, las disposiciones de las pólizas de forma integral, con el propósito de discernir cuáles eran las expectativas de las partes al pactar la cubierta. Como es de esperar, este proceso estará sujeto a la regla interpretativa de que toda ambigüedad deberá ser resuelta a favor del asegurado. Librotex II.

A base de lo anterior nos corresponde, por tanto, resolver en primera instancia, si los términos según vertidos en la referida póliza resultan claros y obligan a las partes según redactados. O si, por el contrario, su imprecisión amerita que nos adentremos más allá para examinar si la parte asegurada confiaba razonablemente en que la póliza sombrilla ocuparía el lugar de la primaria, de declararse ésta insolvente.

Entre los tres (3) tipos de lenguaje evaluados en nuestra opinión de Librotex II resolvimos que aquel que describe la cubierta como "en exceso de los límites de las pólizas descritas en el propio contrato" se halla "claramente exent[o] de toda ambigüedad" y por lo tanto, no puede compelerse el descenso. Librotex II, pág. 827. Esta observación corresponde a la tercera categoría de cláusulas allí identificadas.

Los términos provistos en la póliza que nos ocupa se le asemejan y no encontramos base alguna para disponer un resultado contrario. Véase, además, Couch on Insurance, Vol.1, 3d, sec. 6:38 págs. 6-150 – 6-152 (12/2009). El monto de cubierta consignado en la póliza de Universal aparece claramente limitado al **exceso** que el asegurado venga llamado a pagar con relación a las pólizas primarias.[15]

---

[15] Contrasta dicha cláusula con aquella que establece que al computar la suma a pagar en calidad de exceso debe tomarse en consideración "cualquier otra cubierta **cobrable** por el asegurado" lo cual puede interpretarse como que da paso al descenso de nivel. Librotex II, pág. 828 (énfasis nuestro).

De otra parte, la póliza sombrilla fija la responsabilidad de pago a "**la pérdida total neta en exceso**" de los límites correspondientes, según especificados en las pólizas primarias detalladas en el contrato. De ninguna manera se condiciona el pago de Universal a que sean o no cobrables las partidas primarias, lo que podría tornar los términos del contrato de seguro en ambiguos conforme aludimos en <u>Librotex II</u>.[16]

Igualmente se establece el límite de responsabilidad de la aseguradora, conforme a lo dispuesto en la póliza, independiente del número de asegurados, reclamaciones interpuestas o de ocurrencias envueltas.[17]

Por último, como requisito para cubierta se le exige al asegurado que mantenga en vigor las pólizas primarias identificadas en la póliza. Se advierte que, en la eventualidad de que se incumpla con esta condición, la

---

[16] La cubierta aparece descrita de la siguiente manera:

**2. UNDERLYING LIMIT – RETAINED LIMIT**

The Company shall be liable **only** for the ultimate net loss [of] the **excess** of the greater of the insured's **underlying limit** or retained limit define[d] as:

(a)    Underlying limit – an amount equal to the limits of liability indicated beside the underlying insurance listed in the schedule of underlying insurance, plus the applicable limits….

(Énfasis nuestro).

[17] A esos efectos, el contrato de seguro provee:

**3. LIMITS OF LIABILITY**

Regardless of the number of persons and organizations who are insureds under this policy and regardless of the number of claims made and suits brought against any or all insureds, **the total limit of the Company's liability for the ultimate net loss resulting from any one occurrence shall not exceed the amount specified in Item 4(a) of the declarations.**

responsabilidad de la aseguradora continuará siendo igual a como si se hubiese dado el cumplimiento.[18]

Conforme las normas de interpretación aplicables a los contratos de seguro, evaluamos las disposiciones antes señaladas en su sentido común y de manera integral. Habida cuenta de que lo enunciado en el acuerdo entre las partes, atinente a la obligación de pago por parte de Universal en calidad de póliza sombrilla, se halla libre de ambigüedad, se hace innecesaria nuestra intervención adicional a los efectos de recoger la expectativa del asegurado. Por lo que, luego de examinar las disposiciones pertinentes de la póliza en cuestión, nos es forzoso concluir que, tal como ocurrió en Librotex II, las mismas resultan claras y no dan margen al descenso de Universal como póliza primaria.

Resolvemos, por tanto, que al Universal contratar con CBI quedó claramente apercibida de que estaba conviniendo la compra de una póliza sombrilla que únicamente pagaría reclamaciones en exceso de la aseguradora primaria y no en su lugar.

---

[18]   La cláusula pertinente dispone como sigue:

**CONDITIONS**

**MAINTENACE OF UNDERLYING INSURANCE**

The policy or policies referred to in the attached Schedule of underlying insurance… shall be maintained in full effect during the currency of this policy…. Failure of the insured to comply with the foregoing shall not invalidate this policy but in the event of such failure, the Company **shall only be liable to the same extent as if the insured had complied with this condition.**

(Énfasis nuestro).

Incidió por tanto el Tribunal de Apelaciones al confirmar la determinación del tribunal juzgador a los efectos de que Universal venía obligada a responder en calidad de aseguradora primaria.

## VII

### TEMERIDAD

Por último, Universal impugna la determinación mediante la cual se le ordenó conjuntamente con los otros demandados, es decir, Sun Alliance, la Asociación y CBI, al pago solidario de cincuenta mil dólares ($50,000.00) en calidad de honorarios de abogado, así como el pago de los intereses pre sentencia por su temeridad en el trámite de su defensa en el caso.

La facultad de imponer honorarios de abogado en casos en que intervenga temeridad o frivolidad surge de la propia Regla 44.1 de Procedimiento Civil.[19] De otra parte, la Regla 44.3(b) de Procedimiento Civil[20] provee para el pago del interés legal en aquellos procesos en que medie

---

[19]  Debido a que la imposición de honorarios se hizo al amparo de las Reglas de Procedimiento Civil de 1979, las utilizaremos en nuestro análisis.

La Regla 44.1(d) de Procedimiento Civil de 1979, 32 L.P.R.A. Ap. III, R. 44.1(d) (2001), establece lo siguiente:

En caso que cualquier parte o su abogado haya procedido con temeridad o frivolidad, el tribunal deberá imponerle en su sentencia al responsable el pago de una suma por concepto de honorarios de abogado que el tribunal entienda correspondan a tal conducta.

[20]  La Regla 44.3(b) de Procedimiento Civil de 1979, 32 L.P.R.A. Ap. III, R. 44.3(b) (2001), dispone lo siguiente en su parte pertinente:

El tribunal también impondrá a la parte que haya procedido con temeridad el pago de interés… desde la radicación de la demanda, en caso de daños y perjuicios, y hasta la fecha en que se dicte sentencia….

tal comportamiento. Ya en ocasiones anteriores hemos resumido el concepto de temeridad como aquella conducta que promueve un pleito que se pudo obviar, lo prolonga innecesariamente o que obliga a una parte a envolverse en trámites evitables. Andamios de P.R. v. Newport Bonding, 179 D.P.R. 503, 519-520 (2010); Marrero Rosado v. Marrero Rosado, 178 D.P.R. 476, 504 (2010); Colón Santos v. Coop. de Seg. Múlt. P.R., 173 D.P.R. 170, 188 (2008). Dicho de otro modo, se entiende que un litigante actúa con temeridad cuando "por su terquedad, obstinación, contumacia e insistencia en una actitud desprovista de fundamentos, obliga a la otra parte, innecesariamente a asumir las molestias, gastos, trabajo e inconveniencias de un pleito". Andamios de P.R. v. Newport Bonding, *supra*, pág. 520; S.L.G. Flores Jiménez v. Colberg, 173 D.P.R. 843, 866 (2008).

La temeridad es improcedente en aquellos litigios que envuelven planteamientos complejos y novedosos aun no resueltos en nuestra jurisdicción. Tampoco ha de emplearse cuando la parte concernida responde a lo que resulta ser una apreciación errónea del derecho sin que existan precedentes vinculantes al respecto o, cuando existe alguna desavenencia honesta en cuanto a cuál de las partes beneficia el derecho aplicable. Santiago v. Sup. Grande, 166 D.P.R. 796, 821 (2006); Oliveras, Inc. v. Universal Ins. Co., 141 D.P.R. 900, 936 (1996).

Esta penalidad tiene como propósito disuadir la litigación frívola, así como fomentar las transacciones, a través de sanciones que compensen a la parte victoriosa de los perjuicios económicos y las molestias ocasionadas por la temeridad desplegada por otra parte en el caso. Marrero Rosado v. Marrero Rosado, *supra*.

La evaluación de si ha mediado o no temeridad recae sobre la sana discreción del tribunal sentenciador y sólo se intervendrá con ella en casos en que dicho foro haya abusado de tal facultad. Marrero Rosado v. Marrero Rosado, *supra*; S.L.G. Flores-Jiménez v. Colberg, *supra*; Colón Santos v. Coop. de Seg. Múlt. P.R., *supra*. Sin embargo, una vez fijada la existencia de temeridad, la imposición del pago de honorarios de abogado es mandatoria. Íd.

Este planteamiento no amerita mayor discusión, excepto acentuar la correspondiente deferencia que le debemos a las determinaciones de temeridad del tribunal *a quo,* forjadas dentro del amplio margen de discreción que le es dispensado. Dadas las circunstancias que rodean este litigio, no encontramos que el juzgador se haya excedido de los lindes de tal atribución. El seguro provisto por Universal era extensivo a la negligencia vicaria imputada a CBI en la Demanda instada por Maderas Tratadas, y posteriormente probada durante el juicio, por constituir dicha conducta una ocurrencia conforme el

término se define en el contrato de seguro. De otra parte, las exclusiones aludidas por la aseguradora claramente no son de aplicación en el contexto de este recurso.

## VIII

## CC-2006-0266

Luego de iniciado este recurso, Maderas Tratadas y el señor Fernández, conjuntamente con Sun Alliance, llegaron a un acuerdo transaccional mediante el cual desistieron de sus reclamaciones mutuas, lo que dio por concluido en su totalidad el recurso CC-2006-0267. Aclararon, no obstante, que interesaban que el recurso CC-2006-0266 continuara su curso respecto a los planteamientos reseñados en tanto y en cuanto conciernen a CBI, la Asociación y Universal, todas partes ajenas al mencionado acuerdo.

A base de lo anterior, colegimos que quedan por resolver en este recurso CC-2006-0266 únicamente dos (2) de las seis (6) controversias inicialmente reseñadas por Maderas Tratadas y el señor Fernández en su alegato. Llegamos a esta conclusión habida cuenta de que en los primeros cuatro (4) errores esbozados en su escrito, éstos cuestionaron exclusivamente la reducción efectuada por el Tribunal de Apelaciones a ciertas partidas de pérdidas económicas acaecidas como consecuencia de "la negativa de [las o sus] aseguradoras de proveer la cubierta

reclamada". Resulta claro que estas impugnaciones iniciales sólo competen a Sun Alliance, a base de su relación de aseguradora frente a Maderas Tratadas, no así a las demás aseguradoras con quienes Maderas Tratadas y el señor Fernández no guardan relación contractual alguna. Veamos.

Como es sabido, las aseguradoras son llamadas a responder en exceso de su cubierta cuando anteponen sus intereses a los de su asegurado y fallan en sus deberes intrínsecos de representación, defensa y/o de transigir las reclamaciones por una cantidad razonable dentro de los límites de cubierta. Véase, por ejemplo, Quiñones López v. Manzano Pozas, 141 D.P.R. 139, 174-175 (1996); Morales v. Automatic Vending Service, Inc., 103 D.P.R. 281 (1975). Sin embargo, en este caso, los principios aludidos no conciernen a la Asociación como tampoco a Universal. Ambas son aseguradoras de CBI y, por lo tanto, su deber fiduciario de proveer una adecuada representación y defensa, además de aceptar transacciones razonables dentro de los límites de sus pólizas, lo tienen únicamente en relación a su asegurado CBI y no frente a un tercero como lo son Maderas Tratadas y el señor Fernández en este caso.

Las razones para ello se han explicado de la siguiente manera:

> The insurer's contractual obligations and its common law duty of good faith and fair dealing are owed to the insured, not to the third party. The third party is not only a

stranger to the relationship between insured and insurer but is a claimant whose claim is usually unliquidated and whose rights to payment of all or any amount on the claim are by the nature of things contestable. The third party is an adversary of the insured and of the insured's liability carrier. As such, it simply cannot suffer any harm from the carrier's handling of the claim. If the third party's claim is not settled because the carrier breached a duty of good faith and fair dealing, the third party has suffered no loss as a result. It still has the right to reduce to judgment its claim against the insured. If the insured's position against a claim has not been properly presented, the third party pursuing that claim has actually benefited as a result.

....

D.J. Wall, Litigation and Prevention of Insurer Bad Faith, 2da ed., Colorado Springs, Shepard's/McGraw-Hill, Inc., 1994, sec. 7.01, pág. 290. Véase, además, W. T. Barker y R. D. Kent, New Appleman Insurance Bad Faith Litigation, 2da ed., LexisNexis, 2010, sec. 1.09[1], págs. 1-45 – 1-46.

Pasamos entonces a las controversias que nos conciernen como parte del recurso CC-2006-0266. La primera de ellas incide en el límite de la responsabilidad de la Asociación por los daños reclamados como consecuencia de los sucesos que dieron base a este litigio. La segunda, concierne a la reducción efectuada por el Tribunal de Apelaciones sobre la partida de costas originalmente concedida por el Tribunal de Primera Instancia a Maderas Tratadas y el señor Fernández por los

gastos relacionados con el Sr. Richard Bell (señor Bell), uno de sus peritos.

## IX

### ASOCIACIÓN DE GARANTÍAS MISCELÁNEAS

Maderas Tratadas cuestiona la reducción de la responsabilidad de la Asociación en este caso al máximo de ciento cincuenta mil dólares ($150,000.00) efectuada por el tribunal apelativo intermedio. Insiste en que la Asociación venía obligada a responder por cada uno de los diecisiete (17) avisos de reclamación sometidos por ésta hasta el máximo de un millón de dólares ($1,000,000.00) de la póliza emitida por ICF.

Mediante la Ley 72, *supra,* se creó la Asociación y como parte de sus objetivos, el estatuto delegó en dicha entidad la responsabilidad de establecer un mecanismo para sufragar reclamaciones atinentes a aseguradoras declaradas insolventes. Artículo 38.020, 26 L.P.R.A. sec. 3802 (2008). El fondo disponible a la Asociación para cumplir con estos fines se nutre de derramas impuestas a las propias aseguradoras. Íd.

La Ley 72, *supra*, prescribe que sus disposiciones deberán ser interpretadas "liberalmente" con el fin de alcanzar los propósitos para los cuales fue diseñada. Artículo 38.040, 26 L.P.R.A. sec. 3804 (2008).

Se define como reclamante "todo asegurado que presente una reclamación como reclamante o toda persona

que radique una reclamación por responsabilidad civil". Artículo 38.050(3), 26 L.P.R.A. sec. 3805(3) (2008). De otra parte, decreta la mencionada ley que reclamación cubierta significa "una reclamación no pagada… que surja de, y esté dentro de la cubierta y esté sujeta a los límites aplicables de una póliza de seguro". Artículo 38.050(6), 26 L.P.R.A. sec. 3805(6) (2008).

Lo dispuesto en la Ley 72, *supra,* aplicable a los hechos del presente recurso,[21] disponía para un pago máximo de ciento cincuenta mil dólares ($150,000.00) "por reclamación". Artículo 38.080(a)(1), 26 L.P.R.A. sec. 3808(a)(1). Advertía, no obstante, que en ningún caso se habría de pagar una cantidad que sobrepasase el "exceso de la obligación del asegurador insolvente bajo la póliza o cubierta de la cual surge la reclamación". Íd. Es decir, se mantenía como límite alterno el establecido en la póliza por la cual estaba compareciendo la Asociación en la eventualidad de que fuese menor de ciento cincuenta mil dólares ($150,000.00),[22] por lo que la obligación de pago se circunscribía a la menor de estas dos (2) cuantías.

En Montañez v. U.P.R., 156 D.P.R. 395 (2002) resolvimos que, conforme al derecho vigente en aquel

---

[21] La cuantía pagadera por la Asociación así como la metodología para el cálculo del pago correspondiente sufrieron cambios sustanciales en el año 2008. En virtud del Artículo 1 de la Ley 262-2008, 26 L.P.R.A. sec. 3808(a)(2) (Supl. 2011), se aumentó el monto pagadero a trescientos mil dólares ($300,000.00) "por evento independientemente del número de reclamantes [y a un máximo] de un millón de dólares ($1,000,000.00) como agregado anual, independientemente del número de eventos cubiertos bajo esa póliza".

[22] Esta disposición igualmente preservó como tope el límite de la póliza del asegurador insolvente.

entonces, la cantidad máxima que venía obligada a pagar la Asociación al sustituir una aseguradora insolvente, se calculaba a base de cada reclamación interpuesta y no fundamentado en cada accidente u ocurrencia. Explicamos que, bajo el concepto de accidente u ocurrencia, la responsabilidad del asegurador se fija en una cantidad máxima por cada evento independientemente del número de reclamaciones o causas de acción que surjan como resultado del mismo. Al estatuto prescribir un límite "por reclamación", sin embargo, se refiere "a cada condena de daños independientemente (*each judgment*) por la cual el asegurado resulte responsable como consecuencia de un accidente; es decir, cada causa de acción independiente". Montañez v. U.P.R., *supra*, pág. 416.

Como único fundamento a su argumento sobre este particular, Maderas Tratadas indica que, habida cuenta de que sometió un total de diecisiete (17) reclamaciones ante la Asociación por los hurtos perpetrados en sus facilidades, le corresponde el pago de ciento cincuenta mil dólares ($150,000.00) por cada una, según dictaminó el foro primario.[23] Ello limitado, por supuesto, hasta el máximo de un millón de dólares ($1,000,000.00) provisto en la póliza de ICF. No obstante, aparte del número de reclamaciones sometidas, Maderas Tratadas no añade

---

[23] Ello equivaldría a un total de dos millones quinientos cincuenta mil dólares ($2,550,000.00).

explicación alguna para justificar su derecho al pago de las cantidades requeridas.

Por otro lado, la Asociación aduce que no existe evidencia en los autos que sustente el número de reclamaciones pretendidas. Argumenta que el hecho de que se le sometieran diecisiete (17) formularios de reclamaciones no es sinónimo de que, en efecto, ocurriesen diecisiete (17) eventos individuales de sustracción de mercancía como se pretende.

Debemos revisar, por ende, si la evidencia sometida en este caso es suficiente para sustentar la determinación del tribunal de instancia como aduce Maderas Tratadas. Según explicamos en Montañez v. U.P.R., *supra,* pág. 416, cada reclamación contemplada en la Ley 72, *supra*, debe corresponder "a cada causa de acción independiente". Por consiguiente, la controversia se reduce a verificar si existe en los autos prueba de diecisiete (17) causas de acción separadas que, a la vez, sustenten cada una de las reclamaciones sometidas por Maderas Tratadas.

Es innegable que se desconoce a ciencia cierta en qué días específicos ocurrieron los hechos que dan lugar a las reclamaciones sometidas a la Asociación, ni la pérdida correspondiente a cada una de ellas. Conforme a los autos, lo único que quedó establecido durante el juicio fue: (1) el total del inventario sustraído a causa de hurto y (2) que esto ocurrió en el transcurso aproximado

de un (1) año, es decir, entre 1991 y 1992. Lo que nos lleva a concluir que, a pesar de que se hayan podido establecer daños en exceso de dos millones de dólares ($2,000,000.00) a base de la pérdida de inventario, no por ello se dan por acreditadas diecisiete (17) causas de acción separadas.

A esos efectos notamos que, al menos cuatro (4) de las cinco (5) querellas sometidas ante la Policía de Puerto Rico que obran en autos, no son contemporáneas con los hurtos alegados. Tampoco se pormenorizan la fecha ni el valor de la mercancía hurtada en esas ocasiones. Por ejemplo, el 10 de diciembre de 1992, se presentaron simultáneamente cuatro (4) querellas referentes a sucesos acaecidos en fechas tan lejanas como junio del año anterior. En cada una de ellas se identifica únicamente el mes en que alegadamente sucedieron los hechos sin precisar un día en particular.[24] Igualmente, se valora la mercancía hurtada meramente en "más de $200.00 dólares".[25]

De otra parte, advertimos que el testimonio del señor Fernández sobre este particular resulta totalmente vago e impreciso. Durante el juicio no pudo establecer las fechas en que ocurrieron los eventos, a la vez que reconoció que no existía base alguna para optar por un

---

[24] Se indica, por ejemplo, "junio 1991 día", "nov. 1991 noche", "dic. 91 noche" y "junio 92 noche".

[25] La quinta querella, correspondiente al 29 de junio de 1992, reporta un escalamiento acaecido durante el fin de semana del 27 al 28 de junio del mismo año, pero nota que el valor de la mercancía hurtada es "desconocido".

número concreto de reclamaciones. Conforme la Exposición Narrativa Estipulada de la Prueba Oral sometida por las partes, indicó lo siguiente:

> [S]obre los hurtos que se reclamaron ante el Comisionado de Seguros por [Maderas Tratadas], el señor Fernández declaró que se colocó ese número (17 formularios) como pudo haberse colocado cualquier otro. Según él, lo importante era que había sido más de uno y no el número exacto de hurtos. Asimismo, el señor Fernández en su testimonio no pudo identificar y/o describir la ocurrencia o perpetración de los (17) hurtos en diferentes fechas.

A base de lo anterior, nos es forzoso concluir que el número de hurtos, las fechas en que éstos sucedieron y el monto de las pérdidas correspondientes a cada uno de estos eventos son desconocidos. Aun interpretando las disposiciones estatutarias liberalmente a favor de la parte reclamante para lograr que se beneficie de sus disposiciones, no podemos llegar a otro resultado. Adentrarse a precisar la cantidad específica de incidentes, así como el valor de la mercancía hurtada en cada ocasión para traducirlos en causas de acción separadas, resulta imposible con la escasa información disponible. Por lo tanto, el total de reclamaciones sometidas por Maderas Tratadas adviene completamente especulativo. Tal como indicó el señor Fernández durante el juicio, se pudo haber seleccionado cualquier número de incidentes al azar.

Actuó, por tanto, correctamente el Tribunal de Apelaciones al resolver que, en este caso, la Asociación

respondía únicamente por la cantidad de ciento cincuenta mil dólares ($150,000.00).

X

**COSTAS – PERITO SR. RICHARD BELL**

Maderas Tratadas está igualmente en desacuerdo con la reducción efectuada por el Tribunal de Apelaciones a los honorarios concedidos por los gastos correspondientes a uno de sus peritos.

En nuestro ordenamiento, la concesión de costas se rige por lo provisto en la Regla 44.1(a) de Procedimiento Civil (Regla 44.1(a)).[26] A través de dicho precepto, se pretende resarcir a la parte que advenga victoriosa en el caso mediante el reembolso de aquellos gastos que se estimen necesarios y razonables para efectos de prevalecer en su posición. J.T.P. Dev. Corp. v. Majestic Realty Corp., 130 D.P.R. 456, 460 (1992); Rodríguez Cancel v. A.E.E., 116 D.P.R. 443, 461 (1985); Ferrer Delgado v. Tribunal Superior, 101 D.P.R. 516, 517 (1973).

---

[26] Utilizamos las disposiciones procesales atinentes a las Reglas de Procedimiento Civil de 1979 porque fue bajo ellas que se concedieron las costas. Notamos, no obstante, que la versión de este inciso en particular correspondiente a las enmiendas del 2009 no conllevó cambios sustanciales.

La Regla 44.1(a) de Procedimiento Civil de 1979, 32 L.P.R.A. Ap. III, R. 44.1(a) (2001), establece lo siguiente:

> Las costas le serán concedidas a la parte a cuyo favor se resuelva el pleito o se dicte sentencia en apelación, excepto en aquellos casos en que se dispusiera lo contrario por ley o por estas reglas. Las costas que podrá conceder el tribunal son los gastos incurridos necesariamente en la tramitación de un pleito o procedimiento que la ley ordena o que el tribunal, en su discreción, estima que un litigante debe rembolsar a otro.

En este sentido, supone una función reparadora puesto que, según expresáramos anteriormente, su derecho "no debe quedar menguado por los gastos que tuvo que incurrir sin su culpa y por culpa del adversario". J.T.P. Dev. Corp. v. Majestic Realty Corp., *supra*; Garriga, Jr. v. Tribunal Superior, 88 D.P.R. 245, 253 (1963). Esta premisa cobra mayor relevancia en la actualidad, habida cuenta del aumento desmedido en la partida de gastos relacionados a los trámites judiciales.

Cabe notar que, una vez reclamadas por la parte prevaleciente, la imposición de costas a beneficio de la parte prevaleciente resulta mandatoria. J.T.P. Dev. Corp. v. Majestic Realty Corp., *supra*; Garriga, Jr. v. Tribunal Superior, *supra*, pág. 248.

En virtud de lo dispuesto en la propia regla, no todos los gastos del litigio son recobrables. J.T.P. Dev. Corp. v. Majestic Realty Corp., *supra*; Andino Nieves v. A.A.A., 123 D.P.R. 712, 716 (1989); Garriga, Jr. v. Tribunal Superior, *supra*. "[L]as costas procesales no cubren la totalidad de los gastos que ocasiona el proceso; ya que no son sinónimos de los gastos del litigio y tienen una interpretación restrictiva que se justifica tradicionalmente en el interés de garantizar el mayor acceso a los litigantes de manera económica." J. A. Cuevas Segarra, Tratado de Derecho Procesal Civil, 2da ed., San Juan, Pubs. J.T.S., Tomo IV, 2011, pág. 1266.

Quedan sujetos a las disposiciones del mencionado precepto procesal únicamente aquellos expendios que se consideren necesarios en la gestión judicial. Igualmente corresponde al tribunal, dentro del marco de su discreción, evaluar la razonabilidad de los mismos. J.T.P. Dev. Corp. v. Majestic Realty Corp., *supra*.

Aunque hemos reconocido que los gastos de un perito están comprendidos dentro del concepto de costas recobrables, advertimos que, en el caso particular de los expertos contratados por las partes, el rembolso opera por vía de excepción y se concederán únicamente cuando ello esté plenamente justificado. Andino Nieves v. A.A.A., *supra*; Toppel v. Toppel, 114 D.P.R. 16, 22 (1983); Meléndez v. Levitt & Sons of P.R., 104 D.P.R. 797, 811 (1976).

> Relativo al caso de honorarios de peritos, su compensación, como gastos, no es automática; el tribunal al pasar juicio sobre si procede o no el pago de dichos honorarios, tendrá que evaluar su naturaleza y utilidad a la luz de los hechos particulares del caso ante su consideración, teniendo la parte que los reclama el deber de demostrar que el testimonio pericial presentado era necesario para que prevaleciera su teoría.

Rodríguez Cancel v. A.E.E., *supra*, pág. 461; Toppel v. Toppel, *supra*.

Así pues, lejos de ser automática, la designación de la compensación de un perito como costas está sujeta a los rigores del escrutinio judicial a través del cual se examinará tanto la naturaleza de su preparación, como la

utilidad de su intervención. Significa esto que, deben tomarse en cuenta las credenciales que ostenta el experto designado para rendir una opinión sobre una materia en particular. También corresponde examinar el alcance de su testimonio, para de este modo estar en posición de aquilatar su utilidad en beneficio de la postura procesal de la parte que resulte victoriosa. Cónsono con lo anterior, se descartará el mismo en la medida en que éste resulte "irrelevante, inmaterial o innecesario" en la tramitación del caso del que solicita el rembolso. Toppel v. Toppel, *supra*, pág. 22; Meléndez v. Levitt & Sons of P.R., *supra*, pág. 811.

El Tribunal de Apelaciones redujo a la mitad[27] la partida de costas relativa a gastos incurridos por Maderas Tratadas en la contratación del señor Bell, uno de sus peritos, por entender que no todo su trabajo y testimonio había sido de utilidad en el litigio.

Para la fecha del juicio, el señor Bell, con una preparación de CPA, se dedicaba a trabajos de consultoría independiente en las áreas de análisis y consultoría financiera. Fue contratado por Maderas Tratadas en el 1995, luego de descubrirse los robos acaecidos durante el año fiscal 1991-1992. Su encomienda era dual. Debía revisar la cuantificación de pérdida efectuada por la

---

[27] Como resultado, dicha cantidad se vio reducida de cincuenta y ocho mil treinta y seis dólares con setenta y nueve centavos ($58,036.79) a veintinueve mil dieciocho dólares con cuarenta centavos ($29,018.40).

firma Semprit & Nieves,**28** auditores externos de la empresa desde 1991, además de analizar las críticas a dichos trabajos según consignadas por el Sr. Roberto Quintana (señor Quintana), el CPA contratado por Sun Alliance como su perito en el caso.

El Sr. Abimael Semprit Cruz, CPA (señor Semprit) también compareció como perito de Maderas Tratadas en el juicio. Su testimonio consistió en establecer que la causa de la pérdida de inventario se debió al hurto perpetrado en la compañía, así como cuantificar dichas pérdidas.

Luego de examinar los segmentos relevantes de la Exposición Narrativa Estipulada de la Prueba Oral sometida por las partes y a la luz de los principios antes mencionados, coincidimos con la apreciación del tribunal apelativo intermedio sobre la utilidad y alcance limitados del testimonio del perito, señor Bell. Su labor estuvo centrada en el cotejo de los trabajos del señor Semprit y el señor Quintana. Según acertadamente lo sintetizó el Tribunal de Apelaciones, su papel se circunscribió a **robustecer** la posición de Maderas Tratadas en el litigio.

De otra parte, la intervención del señor Semprit se calificó como indispensable y necesaria para la resolución del caso a favor de Maderas Tratadas y sus honorarios fueron adjudicados íntegramente como costas.

---

**28**     Para la fecha del juicio, la firma se denominaba Howath Vélez Semprit & Co.

A base de lo anterior, somos del criterio que no erró el Tribunal de Apelaciones al reducir en un cincuenta porciento (50%) los honorarios del señor Bell en este caso.

**XI**

En mérito de lo antes expuesto, modificamos la Sentencia del Tribunal de Apelaciones a los únicos efectos de decretar que no procede el descenso de nivel de la póliza de Universal, por lo que ésta no asumirá las partidas impuestas a ICF y, así modificada, se confirma.

Se dictará Sentencia de conformidad.

ROBERTO FELIBERTI CINTRÓN
JUEZ ASOCIADO

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| MADERAS TRATADAS, INC.; LUIS J. FERNÁNDEZ EN SU CARÁCTER PERSONAL<br><br>Recurridos<br><br>v.<br><br>SUN ALLIANCE INSURANCE COMPANY; EL FÉNIX DE PUERTO RICO; JUAN DEL PUEBLO<br><br>UNIVERSAL INSURANCE COMPANY<br><br>Peticionaria | *Certiorari*<br><br><br><br><br>Núm.: **CC-2006-0228**<br><br>CONSOLIDADO CON |
| MADERAS TRATADAS, INC.; LUIS J. FERNÁNDEZ EN SU CARÁCTER PERSONAL<br><br>Peticionarios<br><br>v.<br><br>CBI SECURITY SERVICES, INC.; JUAN D. GONZÁLEZ COLÓN, SU ESPOSA JANE DOE Y LA SOCIEDAD LEGAL DE GANANCIALES CONSTITUIDA POR AMBOS; COMPAÑÍA DE SEGUROS ABC; COMPAÑÍA DE SEGUROS XYZ; FULANO DE TAL Y SUTANO DE TAL<br><br>Recurridos | **CC-2006-0266** |

**SENTENCIA**

En San Juan, Puerto Rico, a 12 de junio de 2012.

Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte íntegra de la presente Sentencia, modificamos la Sentencia emitida por

el Tribunal de Apelaciones a los únicos efectos de decretar que no procede el descenso de nivel de la póliza de Universal Insurance Company, por lo que ésta no asumirá las partidas impuestas a Insurance Company of Florida y, así modificada, se confirma.

Así lo pronunció y manda el Tribunal y certifica la Secretaria del Tribunal Supremo. El Juez Presidente señor Hernández Denton inhibido. La Juez Asociada señora Rodríguez Rodríguez no intervino.

Aida Ileana Oquendo Graulau
Secretaria del Tribunal Supremo